# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| ADRIA E. ROBERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 12-0669-WS-N |
| | ) | |
| BANCORPSOUTH BANK, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

This matter comes before the Court on Defendant's Motion for Summary Judgment (doc. 50). The Motion has been briefed and is now ripe for disposition.[1]

## I. Nature of the Case.

Plaintiff, Adria E. "Andy" Roberson, brought this consolidated action against defendant, BancorpSouth Bank, Inc. ("Bancorp"), alleging various statutory and common-law claims relating to her employment at Bancorp, and the termination of same. At present, the only claims asserted in this action sound under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII").[2]

---

[1]    By Order (doc. 67) dated November 12, 2013, the undersigned directed defendant to provide a full set of hard copies of exhibits filed in connection with its summary judgment motion, as required by Paragraph 13(c) of the Rule 16(b) Scheduling Order. Defendant did so. Due to an oversight, no corresponding instruction was given to plaintiff's counsel, even though plaintiff's exhibits likewise exceeded the 50-page threshold specified in Paragraph 13(c). To be clear, the Court has carefully reviewed all of the parties' exhibits, whether courtesy hard copies were or were not supplied.

[2]    Originally, plaintiff's pleadings also named Philip Webb as a defendant. Via Order (doc. 27) entered on June 19, 2013, the undersigned granted defendants' Motion for Judgment on the Pleadings as to Roberson's state-law claim of outrage against Webb. Because plaintiff asserted no other claims or causes of action against Webb, he was dismissed as a party to these proceedings. The June 19 Order also dismissed plaintiff's state-law claims against Bancorp, which sounded in theories of outrage and negligent/wanton hiring, training, supervision and retention.

The precise contours of Roberson's claims are a source of disagreement in the parties' summary judgment filings. Therefore, it is prudent at the outset to delineate Roberson's claims as they were actually pleaded. Plaintiff's Complaint purported to bring claims of "gender discrimination, sexual harassment, and retaliation against her person" under Title VII. (Doc. 1, at 1-2.) Specifically, Count I of the Complaint was labeled "Harassment" and purported to be predicated on "sexual harassment and repulsive behavior of Mrs. Roberson's immediate supervisor," as manifested by emails and discussions about whether office personnel "were physically attractive or 'hot,'" "verbal commentary regarding the use of Viagra," "actual disbursement of Viagra," dissemination of jokes with punch lines like "learning to live with the pricks in your life," and "an uninhibited barrage of nude or partially nude photographs which inappropriately highlighted human anatomy including captions of a prurient and lewd nature." (Doc. 1, ¶¶ 15-19.) Count II was labeled "Gender Discrimination" and alleged gender-based compensation disparities and "sexual commentary" in which Roberson's supervisor explained that female employees whom he deemed physically attractive were "going somewhere in this bank." (*Id.*, ¶¶ 21-23.)

Finally, Count III of the Complaint was labeled "Retaliation," and asserted that Roberson "was retaliated against as a result of her reporting the above described sexual harassment and gender discrimination violations through the appropriate Bancorp chain of command, including to one David Wright and/or Jerome Dominancy [*sic*]." (*Id.*, ¶ 25.) According to Count III, this retaliation took the form of Roberson "having to endure hostile workplace treatment and novel protocols," being "publically embarrassed and/or berated by her immediate supervisor," and having Bancorp management "conspire[] to fabricate false grounds for termination and/or create such a hostile environment as to force her to voluntarily resign." (*Id.*, ¶¶ 26-29.) Nowhere does Count III mention Roberson's EEOC Charge of Discrimination, or suggest that Bancorp retaliated against her for filing that Charge or for meeting with EEOC officials in conjunction with same. As framed in the Complaint, the protected activity animating Count III is confined to Roberson's "reporting the above described sexual harassment and gender discrimination violations through the appropriate Bancorp chain of command." (*Id.*, ¶ 25.)[3]

---

[3]     Roberson reinforced this theory by stating in the Report of Parties' Planning Meeting that "she reported this harassment **to the proper company representatives** as required by (Continued)

## II.    Background Facts.[4]

### A.    Roberson's Employment History at Bancorp.

In 2005, Bancorp hired Roberson as Vice President for its branches in Baldwin County, Alabama. (Roberson Dep. (doc. 55, Exh. A), at 21-22.) At some point, Roberson became manager of Bancorp's Foley branch. (*Id.* at 23.) In this capacity, her job duties included managing the branch, as well as serving as loan officer, community reinvestment coordinator, operations coordinator, human resources coordinator and audit coordinator. (*Id.*) Roberson reported directly to Philip Webb, President of Bancorp's Baldwin County branches. (*Id.* at 24; Roberson Aff. (doc. 64, Exh. A), ¶ 1.) By all accounts, Roberson's working relationship with Webb was positive and cordial for several years. (Webb Dep. (doc. 64), at 11.)[5]

Things changed in the summer of 2011, when Roberson requested a raise after Bancorp hired several new employees to grow the company's business in Baldwin County. (Roberson Dep., at 29-32.) Roberson's reasoning for the request was that Bancorp's hiring of two new vice presidents in the Foley office meant that Roberson "was going to be doing a lot more work … because [she] was doing so many people's jobs and trying to keep up with [her] own, and with

---

the Defendant's company policies. In response to this report, the Plaintiff alleges that she was systematically harassed and discriminated against." (Doc. 15, at 1-2 (emphasis added).) As with the Complaint, the Report of Parties' Planning Meeting omitted any suggestion that the impetus for the complained-of retaliation was Roberson's EEOC Charge.

[4]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] Plaintiff's version of the facts drawing all justifiable inferences in Plaintiff's favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

[5]    Plaintiff has attached various deposition excerpts to her summary judgment submission, but has not assigned specific exhibit numbers to them; therefore, this Order will cite generically to plaintiff's summary judgment filing (doc. 64) when referencing these deposition excerpts, given plaintiff's omission of exhibit identifiers.

more employees, it was just going to be putting more on [her]." (*Id.* at 29.) Webb summarily denied the raise request, telling Roberson that she made "damn good for what [she] did." (*Id.* at 30.) Everyone agrees that the relationship between Webb and Roberson "deteriorated" thereafter. (Roberson Aff., ¶ 2; Webb Dep., at 14.)

### B.     October 2011 Counseling Memo and "Harassment" Complaint.

On October 6, 2011, Webb issued a detailed "Counseling Memorandum" to Roberson, describing an incident in which he perceived Roberson's conduct towards him to have been "unprofessional, inappropriate, insubordinate and exhibited a lack of respect for the President's position and authority." (Doc. 56, Exh. E, at 2.)[6] Roberson refused to sign the Memorandum, and instead submitted a three-page written rebuttal. (Doc. 56, Exh. E & F.) Tensions mounted between Webb and Roberson over the next couple of weeks. On Saturday, October 15, 2011, Webb angrily confronted Roberson by telephone after she called in as unavailable for a scheduled work shift, forcing Webb to cancel personal plans and work in her stead. (Roberson Dep., at 53-55.)

Two days later, on October 17, 2011, Roberson sent an email to David Wright, BancSouth's Regional President (and Webb's direct supervisor), complaining about Webb's treatment of her in the Saturday phone call, among other things. (Doc. 56, Exh. G.) Roberson indicated, "I am still getting harassed by Philip [Webb]," and wrote that he had been "so ugly" to her in the Saturday telephone call. (*Id.*) Roberson elaborated, "I have a 2 in binder full of black and white information on him and he also gave my husband on company time a viager [*sic*] pill a

---

[6]     The episode was sparked by a longstanding Bancorp customer's complaint that Roberson had referred a business prospect to her husband when Roberson knew the prospect to be working with the Bancorp customer. Webb investigated the allegation and ultimately accepted Roberson's explanation that she had not diverted the prospect to her husband's construction business. Despite this outcome, Roberson loudly expressed dissatisfaction with Webb's handling of the issue in the bank lobby and in the presence of others. That outburst led to the Counseling Memorandum. (Doc. 56, Exh. E.) Roberson disagrees with much of that Memorandum, but acknowledges that she was "upset" and that she might have been loud because "[her] voice carries." (Roberson Dep. at 37-38.) At the time, Roberson conceded that her conduct may have crossed the line, as she wrote, "Was this exchange unprofessional? Maybe: [*sic*] Was it inappropriate? Maybe: [*sic*]." (Doc. 56, Exh. F, at 2.) She also admitted, "Everyone knows that I have a tendency to be loud and voiceful [*sic*] on occasions." (*Id.*) That tendency (and Bancorp's insistence that Roberson moderate it) was the stated reason for the Counseling Memorandum.

few months ago." (*Id.*)[7] The October 17 email also included allegations that Roberson "had to go to the hospital last week because of all the pressure he has put on me," that she was under a doctor's care, and that she could not return to work until he released her. (*Id.*) The email concluded, "I would love for you to let me know today what I need to do come to work when the Doctor releases me or fired [*sic*]." (*Id.*) That afternoon, Wright responded that "it would be more appropriate" for such discussions to occur after the doctor released her to work. (*Id.*)

Roberson returned to work at Bancorp on October 24, 2011 and contacted Wright via email that afternoon. (Doc. 56, Exh. H.) In the October 24 email, Roberson requested "a good heart to heart talk" with Wright "about a lot of issues that is [*sic*] going on here." (*Id.*) Wright suggested they talk by telephone on the afternoon of October 25. When Roberson responded that she wanted to show him documents, Wright encouraged her to email him whatever she deemed the most important items. (*Id.*)

On October 25, Roberson had a telephone conversation with Wright, who was joined by Jerome Dominescy, Bancorp's First Vice-President of Human Resources for the Alabama/ Florida Region. (Roberson Dep., at 92.) Prior to the call, Roberson emailed copies of various documents to Wright. (*Id.* at 67.) Those materials included the following: (i) photographs of Webb at a company Christmas party, which depicted him wearing his shoes backwards at a bowling alley; (ii) five pages of forwarded political emails describing the perceived deficiencies of President Obama and extolling the virtues of former President Bush; (iii) numerous pages of forwarded emails with photos and captions of the "People of Wal-Mart," often depicting male and female patrons dressed shabbily, bizarrely, or scantily, with comments lampooning their appearance;[8] (iv) an email exchange between Roberson and Webb on June 24, 2011, in which

---

[7] Record facts concerning the Viagra incident were that, on one occasion, Webb discussed Viagra with Roberson in the presence of both of their spouses. (Webb Aff. (doc. 59, Exh. R), ¶ E.) On another occasion, Webb gave Roberson's husband a Viagra pill prior to the Robersons' wedding anniversary. (*Id.*) Roberson professes not to recall anything about the incident, including the nature of the conversation between her husband and Webb, her husband's reaction, or anything else. (Roberson Dep., at 204.) According to Roberson, she "wasn't paying attention" and her husband said nothing about it other than that "Philip was an idiot," after which "we weren't talking about that anymore." (*Id.*)

[8] A fairly representative example is a photograph taken from behind a woman walking past a pumpkin display in a Wal-Mart store. The woman is wearing a skirt hanging so low on her hips that her thong underwear is exposed. A young girl is walking behind the (Continued)

Webb commented, "All the women there are not hot," Roberson responded, "That is one thing I will not repeat especially to my ladies over here," and Webb replied, "How much do I owe you;" (v) a March 27, 2007 email in which Webb responded to a message that a bug had been found in his email by writing, "I keep squishing the damn bug on my screen and can't kill it;" (vi) a forwarded email with photos depicting a luxury automobile, juxtaposed with a political comment criticizing President Obama; (vii) a July 25, 2011 email from Webb containing a quotation ascribed to Larry the Cable Guy that Cajuns must be intelligent because "[a]nybody that would build a city 5 feet below sea level in a hurricane zone and fill it with Democrats that can't swim is a damn genius;" (viii) a February 3, 2011 email inquiry from Roberson to Webb asking how to pronounce the name of Ibiyinka Alao, who was giving a presentation at the Eastern Shore Art Center, with Webb's response, "I think it is I be yankin' off alone;" and (ix) a June 29, 2011 email forwarded by Webb concerning the "fable of the porcupine," with the punchline, "Learn to live with the pricks in your life." (Doc. 57, Exh. I.)[9]

        In her ensuing conversation with Wright and Dominescy, Roberson said that "there was some issues" and referenced "the e-mails and what had been taking place." (Roberson Dep., at 93.) Roberson does not recall accusing Webb of sexual harassment during that conversation, and there is no evidence that she did so.[10] At most, she "worded it as just harassment." (*Id.* at 175.) At the conclusion of that call, Wright and Dominescy determined that Webb should be disciplined for distributing inappropriate emails to company employees. Accordingly, on

---

woman. The photograph's caption reads, "Mommy, why are u wearing my thong…." (Doc. 57, Exh. I, at 17.) Another example is a photograph taken from behind what appears to be a man near a Snapple drink display, with his trousers hanging so low that the top of his buttocks is visible. The caption reads, "Snapple my butt …" (Doc. 57, Exh. I, at 18.)

    [9]    The summary judgment record reflects that Webb forwarded many of these emails to men and women alike, rather than singling out Roberson. For example, Webb transmitted the "People of Wal-Mart" email to five people, including male Bancorp employees Bill Ainsworth and Jep Pollard. He forwarded the "Porcupine" email to 17 people, including male and female employees.

    [10]    Uncontroverted record evidence shows that Roberson did not even tell Wright and Dominescy that she found these messages offensive. (Doc. 58, Exh. K.) Rather, the gravamen of her internal complaint was that she should not have been issued a Counseling Memorandum, when Webb had engaged in equally culpable behavior with no adverse repercussions.

October 31, 2011, Bancorp issued a "Written Warning Memorandum" to Webb documenting the "inappropriate and unprofessional" emails, cautioning him that such conduct "cannot recur," reinforcing the importance of complying with Bancorp's policies concerning email usage and harassment, and noting that further incidents would result in further discipline, up to and including termination. (Doc. 58, Exh. K.) Webb never sent any non-work related emails to Roberson from that point onward. (Webb Aff. (doc. 59, Exh. R), ¶ C.)[11]

Plaintiff's evidence is that after she reported Webb's emails to Bancorp, he "began to treat [her] differently than before." (Roberson Aff., ¶ 2.) In particular, plaintiff maintains that Webb yelled at her, humiliated her, said he had no use for her, and ultimately refused to communicate with her. (*Id.*) During this timeframe, other Bancorp employees observed what they perceived as "verbal abuse" by Webb directed toward Roberson, although these observations are framed in generalities and lack specifics as to conduct or timing. (Gorum Aff. (doc. 64, Exh. B), ¶ 4; Pollard Aff. (doc. 64, Exh. F), ¶ 3.)[12] Notwithstanding these events, Roberson continued working with Webb, and never concluded that she was unable to do so. (Roberson Dep., at 122.)

###    C.    *February 2012 Discipline and Subsequent Termination.*

The matter came to a head in February 2012, when Webb (along with a Bancorp human resources coordinator, Ann Rumley) met with Roberson to discuss her 2011 performance evaluation (the "Evaluation"). On a scale of 0 to 4, the Evaluation rated Roberson a 1.5, which translates into a rating of "Commendable." (Doc. 58, Exh. L.)[13] Roberson was rated

---

[11]    This fact is corroborated by Roberson's deposition testimony that she did not receive any emails from Webb that she perceived as sexually harassing after August 2011, or after the October 2011 meeting. (Roberson Dep., at 174.)

[12]    From Bancorp's perspective, the problem during this period of time was that Roberson "did not appear willing to accept the sharing of responsibilities" (Webb Dep. (doc. 56, Exh. D), at 14) and that Roberson remained "very concerned and unaccepting of having a written counseling document placed in her file" from the October 6 incident (Dominescy Dep. (doc. 56, Exh. C), at 20). Of course, on summary judgment the record is viewed in the light most favorable to the non-movant; therefore, the Court assumes for purposes of this Order that Webb was unduly harsh in his treatment of Roberson following her October 2011 "harassment" report.

[13]    On its face, that label is incongruous with the low numerical score. Be that as it may, Bancorp's preprinted evaluation form provided that ratings between 0 and 1 equate to "Unsatisfactory," 1.1 to 2 are "Commendable," 2.1 to 3 are "Excellent," and 3.1 to 4 are (Continued)

"Unsatisfactory" in the categories of loan originations, branch management, support of the sales process, and leadership effectiveness. (*Id.*) The Evaluation contained detailed written comments from Webb, including remarks that Roberson had questioned him on confidential information she was unauthorized to know, had challenged and undermined him during group meetings, had failed to use active listening skills, had made derogatory comments to staff members about corporate issues, and had utilized a leadership style that prompted employees to complain of tension and apprehension. (*Id.*) Webb's summary comment was that "Andy has admirable sales skills, but need [*sic*] to improve on her management skills. Most of Andy's written correspondence has spelling and grammar mistakes. Needs to work on correct word pronouncation [*sic*]." (*Id.*)[14]

Roberson did not comment on the Evaluation when Webb and Rumley presented it on February 8, 2012; however, she refused to sign it. (Roberson Dep., at 130.) The next day, she returned the Evaluation to Webb with a handwritten notation, "I do not agree with this Review. I will send you a memo in a few days." (Doc. 58, Exh. L.) On the morning of February 9, Roberson called Dominescy and asked if he agreed with her review. (Dominescy Dep., at 33-35; doc. 66, Exh. W.) He responded that he did agree with the guidance in her Evaluation concerning leadership and behavior, but that if she had questions relating to quantitative aspects (*i.e.*, sales goals and the like), she should discuss those with Webb. (*Id.*) Later that day, Roberson sent an email to Webb (who was in transit to Birmingham for a Bancorp regional staff meeting scheduled for February 10) in which she announced, "I will be out of the office from now to February 21st," explaining only that she had "an appointment in the morning then headed

---

"Distinguished." (*Id.*) So plaintiff's Evaluation rated her a mere half point above "Unsatisfactory." On summary judgment, plaintiff endeavors to exploit the logical disconnect between her low score and her "Commendable" rating. For purposes of this Order, the overall tenor, tone and content of the Evaluation speak for themselves and will be considered as a whole, rather than focusing exclusively on a potentially misleading one-word summary.

[14] In terms of overall scores, the other Bancorp branch managers in Baldwin County received evaluations from Webb that were higher than, but commensurate with, Roberson's. In particular, Jennifer Gorum (Spanish Fort branch manager) received a score of 1.8 and James "Jep" Pollard (Fairhope branch manager) received a score of 2.0, as compared to Roberson's 1.5. (Doc. 58, Exh. L.)

out of town." (Doc. 58, Exh. N.) Webb had previously approved some of those days off, but not others. Roberson had not followed Bancorp's protocol for requesting time off, and Webb feared that the branch would be short-staffed. (Webb Dep., at 45-47; doc. 66, Exh. W.) Ultimately, Roberson was told that she could not have February 9 and 10 off from work. (Roberson Dep., at 143.) Roberson sent additional emails to Webb explaining her whereabouts on February 9 and indicating that she had an 8:00 a.m. appointment on February 10 that she could not miss, after which she would come to work. (Doc. 58, at Exhs. O and P.)

On February 10, 2012, events spiraled out of control. At 8:10 a.m., Roberson sent an email to Webb, Wright, Dominescy and Rumley announcing that she had canceled her appointment and had come to work. (Doc. 58, Exh. Q, at 3.) In that email, Roberson also indicated that (i) she would be on vacation the following week, (ii) she had attempted to call on a person named Bill Session for bank business the previous day, (iii) she was "humiliated and embarrassed" that the bank had required her to provide documentation that she had called on a prospect on February 9, (iv) she thought she was "entitled to" have Saturday off, and (v) she was "[s]orry for the misspelled words yesterday." (*Id.*) Barely an hour later, at 9:18 a.m., Roberson transmitted a lengthy email to Wright and Dominescy in which she insisted that Webb "is trying to get me fired" and that he had "harassed me and retaliated against me in any way he can." (Doc. 58, Exh. Q, at 1.) The 9:18 email was both defensive and sharply critical of Webb, suggesting that he "has all of you so fooled," that she was being "punished for nothing," that she knew "more about banking than he will ever know," that her Evaluation was "mostly LIES," that Webb often left work to go tend his garden, that the Evaluation's "numbers are so wrong," that Webb "has treated me like a piece of dirt," that "I have been made out a liar and no one believes me," that other employees were improperly sharing passwords, that "I have no future with [Bancorp] because I have a big target on my back and have been told that I am a trouble maker," and that she knew she would not "get any response back" from this email. (*Id.* at 1-2.) After the 8:10 and 9:18 emails, Roberson fired off three more emails to Dominescy and Wright over the next 90 minutes, one attaching a photograph of what she claimed was an employee wrongfully using another's password,[15] another attaching documentation of a February 9 doctor's

---

[15]     This accusation was factually unfounded because Bancorp's investigation revealed that the employee in question had actually logged into his computer, entered his
(Continued)

appointment, and the third attaching a financial report with the message, "we did not do so bad." (Doc. 58, Exh. Q, at 4-13.)

Bancorp officials were concerned by this barrage of emails that Roberson had transmitted with full knowledge that they were in the midst of an important bank meeting in Birmingham.[16] A conference call was convened on the afternoon of February 10 involving Wright, Dominescy, Ken Anderson (Bancorp's Director of Human Resources), Webb, and outside counsel. (Doc. 66, Exh. W, at 2; Wright Dep., at 24-25; Dominescy Dep., at 43-44.) Wright explained that "the discussion was driven by the whole series of problems we had been having with And[y]'s conduct going back to 2011. But this series of e-mails was just the last one at that point." (Wright Dep., at 26.) The "volume and timing" of Roberson's emails that morning "seemed to be symptomatic of the ongoing issue," rather than being the issue themselves. (Dominescy Dep., at 44.)[17] Ultimately, Wright recommended that Roberson be placed on administrative leave immediately because "the environment that was being created by And[y], both in the bank with employees as well as in the branch, had basically become intolerable for us. It was a negative factor on the operation and ongoing operation of the branch." (Wright Dep., at 27.) Dominescy elaborated that, with respect to Roberson's behavior and leadership deficiencies, bank officials concluded that "the message wasn't getting through, the behavior wasn't changing, and it is time to take some kind of decisive action regarding that." (Dominescy Dep., at 51.) The decision to place Roberson on administrative leave was made late that afternoon by Anderson, Wright and Dominescy. (Anderson Decl. (doc. 66, Exh. U), ¶ 3; Dominescy Dep., at 52-53.) Webb did not

---

passwords, and then allowed a colleague to work at his workstation, without actually disclosing his passwords. (Webb Dep., at 27-28.)

[16] As Dominescy explained, the problem with these emails "was the volume and the topic at a time that people were otherwise occupied, and her knowing that." (Dominescy Dep., at 40.) Based on these continuous emails sent during a regional staff meeting, bank officials convened a conference call to "discuss the situation and to determine what action and how we should proceed and respond to it." (*Id.* at 41.)

[17] Dominescy placed the emails in context as "the culmination of a series of actions and lack of changing in behavior on Andy's part that tends to date back at least to October, if not going back all the way to August." (*Id.* at 45.)

participate in the decision, and was not present when the decision was made. (Anderson Decl. (doc. 66, Exh. U), ¶ 3; Dominescy Dep., at 52-53, 55-56; Webb Dep., at 60.)[18]

On Monday, February 13, 2012, Dominescy called Roberson and informed her that she had been placed on administrative leave and was not to return to work. (Dominescy Dep., at 57.) When she asked why, Dominescy responded that the decision had been "the culmination of a series of actions and events over the last several months, or something to that effect." (*Id.* at 58.) On the morning of February 14, 2012, Roberson drove up to the drive-through window at the Foley bank branch and dropped off her company keys, credit card and Sam's card. (Doc. 66, Exh. V.) Roberson notified the teller that a letter would be coming and that it should be delivered to Webb. (*Id.*) The letter, which was from the U.S. Equal Employment Opportunity Commission and postmarked February 10, was delivered later that morning, and routed to Bancorp manager Ann Rumley. (*Id.*; doc. 66, Exh. W.)[19]

---

[18]     Plaintiff endeavors to create a factual dispute as to whether Webb was involved in making the decision to place her on administrative leave. In particular, Roberson states that based on her understanding of Bancorp policies, "in order for me to be suspended and terminated, the process would have started with Philip Webb and he would have been integral to making that decision." (Roberson Aff., ¶ 10.) Another Bancorp branch manager, James E. Pollard, avers that "[t]here is no way that Andy was suspended and fired without the decision going through Philip Webb." (Pollard Aff. (doc. 64, Exh. F), ¶ 9.) This testimony is not accepted on summary judgment because it is speculative and not based on personal knowledge. *See* Rule 56(c)(4), Fed.R.Civ.P. (summary judgment affidavits "must be made on personal knowledge" and "set out facts that would be admissible in evidence"); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (citation omitted). Neither Roberson nor Pollard has personal knowledge of Bancorp's decisionmaking process for Roberson's suspension. Nor do they offer any factual basis for their speculative extrapolation that company protocols for dismissing Bancorp staff members apply identically to the termination of a Vice President / Branch Manager who had accused her direct supervisor of harassment and who had a history of acrimonious dealings with such supervisor. For these reasons, the Court credits defendant's evidence that Bancorp took pains to screen Webb out of the decisionmaking process in Roberson's case because of the "tumultuous history" between them and Roberson's previous accusations of "harassment" by Webb. (Anderson Decl., ¶¶ 6, 8.)

[19]     Plaintiff relies on statements of Roberson and Pollard to assert that Bancorp actually received the EEOC Charge in the mail on Saturday, February 11, 2012. (Roberson Aff., ¶ 7; Pollard Aff., ¶ 6.) Both of these statements are rooted in speculation and hearsay. Neither Roberson nor Pollard has personal knowledge of when Bancorp received (much less opened and reviewed) the mailing containing Roberson's EEOC Charge. Their efforts to create a genuine (Continued)

The administrative leave imposed on February 10 was accompanied by a contemporaneous recommendation from Wright, Dominescy and Anderson that Roberson's employment at Bancorp be terminated. (Dominescy Dep., at 54, 59-60; Wright Dep., at 36; Anderson Decl., ¶¶ 4, 6.) The final termination decision rested with Aubrey Patterson, Bancorp's chairman. (Dominescy Dep., at 49; Wright Dep., at 36.) Nonetheless, it is understood that when a Bancorp employee is placed on administrative leave, his or her employment is "[m]ost often" terminated. (Wright Dep., at 42.) The purpose of administrative leave at Bancorp is "[t]o review the facts and see if it's merited to release the person." (Webb Dep., at 63.) Roberson remained on a paid leave of absence until April 19, 2012. (Roberson Dep., at 165.) On that date, Bancorp notified Roberson's attorney in writing that her employment was being terminated effective immediately. (Doc. 64, Exh. I.)

### D.   *Plaintiff's Activities at the EEOC.*

Roberson initially contacted the Equal Employment Opportunity Commission on December 2, 2011. (Roberson Aff., ¶ 3) Records show that she completed an EEOC Intake Questionnaire on that date, alleging that Webb was discriminating and retaliating against her by "being very rude and cutting me off in front of other officers" and "[h]iring in others [male and female] with same title with less responsibility making way more." (Doc. 64, Exh. C, ¶ 5.) On the latter point, she identified Bill Ainsworth and Ann Rumley as Bancorp employees who were paid "more with less responsibilities." (*Id.*, ¶ 8.)

Notwithstanding her December 2011 discussion with the EEOC, Roberson did not file a formal Charge of Discrimination against Bancorp until February 9, 2012. (Roberson Aff., ¶ 5.) On February 10, 2012, the EEOC issued a Notice of Charge of Discrimination to Bancorp, stating that Roberson was alleging that Webb had sexually harassed her from her hire date through late 2011 and then disciplined her "because she would not acquiesce to Webb's sexual advances." (Doc. 64, Exh. G.) The EEOC mailed the Notice to Bancorp at its Foley branch address.

--------

issue of material fact on that point via guesswork, speculation, assumption and hearsay are improper and will not be countenanced pursuant to Rule 56(c)(4).

Uncontroverted record evidence shows that Bancorp decision makers were unaware of these developments as of their February 10, 2012 decision to place Roberson on administrative leave and recommend her termination. As of that date, Wright was unaware that she had met with the EEOC. (Wright Dep., at 29.) Dominescy first learned that Roberson had been talking to the EEOC when Bancorp's Foley branch received her EEOC Charge in the mail. (Dominescy Dep., at 58-59; doc. 66, Exh. W.) And Anderson had no knowledge that Roberson had been to the EEOC until after the decision to place her on administrative leave and recommend termination of employment had been made. (Anderson Decl., ¶ 7.)[20]

On March 16, 2012, during her administrative suspension, Roberson amended her EEOC Charge by adding new retaliation allegations. The amended version of her Charge alleged that Roberson had been placed on administrative leave and stated, "I believe I was disciplined because I would not acquiesce to Webb's sexual advances and because I complained of sexual harassment and retaliation to the sexual harassment." (Doc. 64, Exh. H.)[21]

---

[20] Plaintiff attempts in her summary judgment filings to establish that Webb was aware of her EEOC activities prior to December 10, 2011. Accepting such an inference as true for summary judgment purposes, the Court nonetheless finds no record evidence that Webb ever shared that information with Wright, Dominescy, Anderson or anyone else involved in the February 10 decision. In the absence of such evidence, the Court will not indulge conjecture that maybe Webb told Bancorp decision makers about Roberson's EEOC activities before they decided to place her on administrative leave and recommend her dismissal. *See, e.g., Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1355 (11th Cir. 1999) (evidence that two corporate officers spoke regularly "is not surprising, nor is it enough to support a reasonable inference that they discussed a specific topic, much less an inference concerning what they said about it," and any jury finding that decision maker was aware of plaintiff's protected conduct "must be supported by reasonable inferences from the evidence, not mere speculation"); *Jones v. Flying J, Inc.*, 2011 WL 149524, *4 n.8 (11th Cir. Jan. 19, 2011) ("evidence that the decision maker spoke with someone who knew of the plaintiff's protected activity did not raise an inference of awareness on the decision maker's part because evidence showing that the decision maker *could have been told* about plaintiff's protected activity is not the same as evidence showing that he *was* told").

[21] Notwithstanding the language of both the original and amended EEOC Charge, there is not and has never been any evidence that Webb engaged in any sexual advances against Roberson. In her deposition, Roberson conceded that "sexual advances" are not at issue in this action and that Webb engaged in no such behavior. (Roberson Dep., at 171-72.) Left unexplained is why Roberson signed the Charge (with its "sexual advances" references) and declared under penalty of perjury that it was true and correct in all particulars.

**III.    Summary Judgment Standard.**

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted); *see also Williamson v. Clarke County Dep't of Human Resources*, 834 F.Supp.2d 1310, 1318 (S.D. Ala. 2011) (recognizing and applying rule that summary judgment standard is applied equally in employment discrimination cases as in other kinds of federal actions).

**IV.    Analysis.**

      *A.    Sexual Harassment Claim.*

As noted, Count I of Roberson's Complaint alleged a Title VII sexual harassment claim against Bancorp, theorizing that Webb had engaged in a campaign of "sexual harassment and repulsive behavior" by sending her emails with offensive comments, jokes and images, and by

disbursing Viagra "while making sexually suggestive or inappropriately vulgar comments." (Doc. 1, ¶¶ 14-19.) Count I characterized these emails as "an uninhibited barrage of nude or partially nude photographs … including captions of a prurient and lewd nature." (*Id.*, ¶ 19.) Given the Complaint's emphasis on sexual harassment in Count I, defendant devoted more than a dozen pages of its principal brief on summary judgment to that topic. (*See* doc. 53, at 11-23.) In response, however, plaintiff's principal brief (submitted by counsel of record) does not even acknowledge the existence of Count I or a Title VII sexual harassment cause of action, much less defend it from dismissal pursuant to Rule 56. (*See* doc. 64.) Plaintiff does not indicate that she is abandoning or withdrawing Count I, but simply ignores it altogether.[22]

Notwithstanding these circumstances, applicable law is clear that "[s]ummary judgment is not automatically granted by virtue of a non-movant's silence." *Williams v. Aircraft Workers Worldwide, Inc.*, 832 F. Supp.2d 1347, 1352 (S.D. Ala. 2011).[23] If a nonmovant fails to respond to a portion of a summary judgment motion, then the court may deem the movant's assertions of fact as to that portion "undisputed for purposes of the motion" and may "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Rule 56(e)(2), Fed.R.Civ.P. In performing such an analysis, a court is not obligated to read minds or to construct arguments or theories that a party failed to raise.[24] As such, Roberson's election not to proffer argument, evidence or authority in

---

[22]  At the conclusion of her summary judgment brief, plaintiff "respectfully moves this Honorable Court to deny the Defendant's Motion or Summary Judgment to the extent they [*sic*] seek a judgment on the Plaintiff's retaliation claims." (Doc. 64, at 20.) However, she does not expressly state her position as to Counts I and II.

[23]  "Even in an unopposed motion [for summary judgment], … the movant is not absolve[d] … of the burden of showing that it is entitled to judgment as a matter of law." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (citations and internal quotation marks omitted); *see also United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004) ("[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion … [and] ensure that the motion itself is supported by evidentiary materials."); Commentary to 2010 Amendments to Fed.R.Civ.P. 56(e) ("summary judgment cannot be granted by default even when there is a complete failure to respond to the motion").

[24]  *See, e.g., Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011) ("district courts cannot concoct or resurrect arguments neither made nor advanced by the parties"); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) (noting that a litigant "cannot readily complain (Continued)

response to the portion of Bancorp's Rule 56 Motion directed at her sexual harassment claim is at her peril. Her omission of any discussion of Count I imparts no burden on this Court to "fill in the blanks" in the legal analysis and briefing on her behalf.[25]

To establish a claim of a sexually hostile work environment, Roberson must show "(1) that … she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (citation omitted); *see also McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (similar). As Bancorp correctly points out, the fourth element is dispositive here.

"To be actionable under Title VII, a hostile work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile and abusive, and one that the victim in fact did perceive to be so." *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1247 (11th Cir. 2004) (internal quotes omitted). In the objective prong of a "severe and pervasive" inquiry, courts examine factors such as "the frequency of the conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's job performance." *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (citation and internal quotation marks omitted). "[S]exual language and

---

about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions") (citation omitted).

[25]     *See, e.g., Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. … Rather, the onus is upon the parties to formulate arguments ….") (citations omitted); *Godfrey v. Nationwide Vinyl Siding & Home Imp., LLC*, 912 F. Supp.2d 1320, 1330 (S.D. Ala. 2012) ("On summary judgment, the Court cannot 'fill in the blanks' to formulate a legal argument that a party has not."); *Minemyer v. B-Roc Representatives, Inc.*, 695 F. Supp.2d 797, 809 (N.D. Ill. 2009) ("[T]his is an adversarial system. It is not a court's task to research legal arguments on a party's behalf.").

discussions that truly are indiscriminate do not themselves establish sexual harassment under Title VII." *Reeves*, 594 F.3d at 809. Moreover, "Title VII is not a civility code, and not all profane or sexual language or conduct will constitute discrimination in the terms and conditions of employment." *Id.* at 807.

Upon careful examination of the record, the Court readily concludes that the alleged harassing conduct (*i.e.,* Webb commenting about the "hotness" of female employees, discussing Viagra on one occasion, giving a Viagra pill to plaintiff's husband on one occasion, sending joke emails with punchlines about "the pricks in your life" or "I be yankin' off alone," and forwarding "People of Wal-Mart" emails) falls far short of the requisite objective severity and pervasiveness. Much of this conduct was directed at male and female employees alike, as Webb forwarded "joke" emails indiscriminately to male and female subordinates. Most or all of this conduct was neither of a sexual nature nor based on Roberson's sex. To the extent that it was sexual at all, Webb's behavior may have been coarse, inappropriate and sophomoric. But it was not severe, it was not physically threatening or humiliating, it was no more than mildly offensive, and it could not have unreasonably interfered with a reasonable person's job performance. In short, the complained-of conduct was plainly not severe and pervasive enough to alter the terms and conditions of Roberson's employment.[26] It therefore is not actionable under Title VII, as a

---

[26] The Eleventh Circuit has found more severe, pervasive, threatening and humiliating conduct than Webb's not to be actionable under Title VII, as a matter of law. *See, e.g., Webb-Edwards v. Orange County Sheriff's Office*, 525 F.3d 1013, 1027-28 (11th Cir. 2008) (supervisor's boorish remarks held not severe and pervasive, where he said that plaintiff looked hot, that she should wear tighter clothes, that women who dye their hair have issues at home, and that he was eating the plaintiff for lunch); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247-48 (11th Cir. 1999) ("severe and pervasive" criterion not satisfied where harasser told plaintiff he was "getting fired up," rubbed his hip against her hip while touching her shoulder, made sniffing sounds while looking at her groin, and followed and stared at her); *Henderson v. Waffle House, Inc.*, 2007 WL 1841103, *3-4 (11th Cir. June 28, 2007) (harassment not severe and pervasive where alleged harasser called plaintiff "Dolly," commented that he would get in trouble if he said why her presence made him nervous, pulled her hair, and made multiple inappropriate comments about her breasts); *Howard v. City of Robertsdale*, 2006 WL 304552, *5 (11th Cir. Feb. 9, 2006) (supervisor's inappropriate comments, including open and notorious sexual comments, jokes and remarks about female employees' bodies and sex lives, do not rise to the level of discrimination under Title VII). The facts in this case are analogous to (albeit less severe than) *Johnson v. Rice*, 237 F. Supp.2d 1330 (M.D. Fla. 2002), in which the court found the harasser's conduct not to be objectively severe or pervasive where he made sexual comments and jokes over a period of six months, the jokes were not physically intimidating or objectively humiliating, the plaintiff was (Continued)

matter of law. On these facts, "[a] finding that [Roberson]'s complaints constitute sexual harassment would lower the bar of Title VII to punish mere bothersome and uncomfortable conduct, and would trivialize true instances of sexual harassment." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) (contrasting facts of that case with that have "involved patterns or allegations of extensive, long lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment"). Accordingly, defendant is entitled to entry of summary judgment in its favor as to Count I.[27]

### B. Retaliation Claim.

#### 1. Prima Facie *Case and Types of Protected Activities.*

To establish a *prima facie* case of retaliation under Title VII, Roberson must show that "(1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) there was a causal link between the two." *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012) (citation omitted); *see also Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009). Critical issues in this case are whether Roberson has made a showing

---

never touched by or alone with the harasser, and most of his comments were not even directed at her. *Id.* at 1336.

[27] The same result attaches with respect to Count II, which alleges that Bancorp engaged in a practice of "blatant inequity in compensation between male and female employees otherwise similarly situated, where male colleagues made substantially more money as decided by Mr. Webb, though they lacked both the experience and educational equivalent or [*sic*] Mrs. Roberson." (Doc. 1, ¶ 21.) The record is devoid of evidence that Bancorp paid similarly situated men higher wages than Roberson, and plaintiff has by all appearances abandoned this cause of action. Indeed, such abandonment dates back to the Report of Parties' Planning Meeting (doc. 15), in which plaintiff's narrative statement did not allude to gender discrimination in compensation. Moreover, plaintiff's own statements establish her dissatisfaction that Bancorp paid men and women higher salaries than she received. For example, according to Roberson's own averments in her EEOC Charge, "[i]n August 2011, Webb hired a female Vice President and paid her substantially more money." (Doc. 64, Exh. H.) This sentiment was echoed in Roberson's EEOC Intake Questionnaire, wherein she complained that "Ann Rumbly" [*sic*] was treated better than she, specifically "Pay more with less responsibilities." (Doc. 64, Exh. C, at 2.) Roberson also indicated in that Questionnaire that Webb was "Hiring in others with same title with less responsability [*sic*] making way more than myself. Men and woman [*sic*]." (*Id.*) Such allegations – even if proven – would establish only that Roberson was paid less than similarly situated male and female coworkers, which cannot constitute gender discrimination under Title VII, as a matter of law. Count II is properly dismissed.

of statutorily protected activity, and more broadly, what type or types of protected activity are at issue.

Title VII prohibits employers from discriminating against employees who have engaged in two distinct forms of protected activity, to-wit: (i) opposing any practice made unlawful by Title VII (the "Opposition Clause"), or (ii) making a charge, testifying, assisting or participating in a Title VII proceeding or investigation (the "Participation Clause"). *See* 42 U.S.C. § 2000e-3(a); *Bourne v. School Bd. of Broward County*, 2013 WL 385420, *2 (11th Cir. Feb. 1, 2013) ("Under Title VII … there are two categories of protected activity: those activities that fit under the 'opposition clause' of 42 U.S.C. § 2000e-3(a) and those activities that fit under the 'participation clause.'") (citation omitted); *Booth v. Pasco County, Fla.*, 829 F. Supp.2d 1180, 1199 (M.D. Fla. 2011) ("When making a retaliation claim under Title VII, one can show that he engaged in protected activity by demonstrating that he qualifies under either the 'opposition clause' or the 'participation clause.'"). Defendant's summary judgment motion implicates both the Opposition Clause and the Participation Clause; therefore, each type of protected activity and its application to plaintiff's claims will be addressed separately.

2. *Opposition Clause Claim.*

As pleaded in the Complaint, plaintiff's retaliation claim invokes the Opposition Clause, not the Participation Clause. Indeed, the linchpin of that claim is that Roberson "was retaliated against as a result of her reporting the above described sexual harassment and gender discrimination violations through the appropriate Bancorp chain of command, including to one David Wright and/or Jerome Dominancy [*sic*]." (Doc. 1, ¶ 25.)

With respect to the Opposition Clause claim, defendant correctly asserts that plaintiff has not met her *prima facie* burden of showing "protected activity" for at least two reasons. First, the record viewed in the light most favorable to Roberson confirms that she never complained about sex discrimination or sexual harassment to Bancorp officials. By her own admission, Roberson's internal complaint was couched in terms of "harassment," not sexual harassment. Nothing in the emails she showed Bancorp officials or the nature of her internal complaint communicated a belief that Roberson was being subjected to a sexually hostile work environment. At most, Roberson's complaint was that she felt the emails were unprofessional (*i.e.*, the emails criticizing President Obama) and/or in poor taste (*i.e.*, the "People of Wal-Mart" emails) and that Webb should be disciplined for sending them to Bancorp employees, just as

Roberson had been disciplined for unprofessional interactions with Webb. Roberson did not profess to believe that she was being forced to endure a work environment permeated with sexual hostility. As such, her internal complaint does not qualify as protected activity for purposes of a *prima facie* case under Title VII. The law is clear that "[a] complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination." *Murphy v. City of Aventura*, 2010 WL 2490932, *3 (11th Cir. June 18, 2010) (employee's internal complaint that supervisor had used "vulgar, inappropriate language" and had engaged in "bullying" was not protected activity where she did not complain that such conduct "was sexually hostile or sexually harassing").[28] Roberson never did so.

Second, even if the record established a reasonable inference that Roberson subjectively perceived Webb's conduct to be sexually harassing (which it does not), defendant would remain entitled to summary judgment on the Opposition Clause claim because any such subjective belief by plaintiff was not objectively reasonable. "A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented." *Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997); *see also Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 857 (11th Cir. 2010) (similar). The reasonableness of such a belief "must be measured against existing substantive law." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010). In that regard, the Eleventh Circuit has rejected the notion that "the conduct opposed must actually be sexual harassment, but it must be close enough to support an objectively reasonable belief that it is."

---

[28]     *See also Coutu v. Martin County Bd. of County Com'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) (employee's internal complaint that "she worked hard and deserved a better rating than Oldland had given her," without alleging discrimination based on a protected class status, was not statutorily protected activity because "[u]nfair treatment, absent discrimination based on race, sex, or national origin, is *not* an unlawful employment practice under Title VII"); *Hawk v. Atlanta Peach Movers*, 2012 WL 1138474, *2 (11th Cir. Apr. 6, 2012) (plaintiff did not engage in protected activity via internal complaints that defendant "acted unfairly towards him" where nothing therein suggested that defendant "was discriminating against him based on a protected ground"); *Sridej v. Brown*, 2010 WL 65195, *2 (11th Cir. Jan. 11, 2010) ("The employee's statements, however, must be about race or gender discrimination to fall within the scope of protected expression under Title VII.").

*Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999). Assuming Roberson did believe that Webb's emails, in conjunction with the Viagra incident, amounted to an unlawful employment practice, her belief was not objectively reasonable because the complained-of conduct is not even close to a Title VII violation. Under existing substantive law, no employee in Roberson's position could reasonably have believed that Webb's tendency to forward "joke" emails like the "People of Wal-Mart," the porcupine fable, the "hotness" email, or the "I be yankin' off alone" email to subordinates created a sexually hostile work environment under Title VII. No employee in Roberson's position could reasonably believe that such a claim could be supported by a one-time discussion of Viagra and the transmission of a single Viagra pill from Webb to Roberson's husband. Again, "[i]t is not even close." *Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008).

In short, defendant has persuasively argued that Roberson failed to establish the first prong of a *prima facie* case of Title VII retaliation under the Opposition Clause because she did not engage in protected activity. Her internal complaints did not concern sexual harassment or a hostile work environment, and nothing in her words to Bancorp managers could have put them on notice that she was complaining about that. Moreover, Roberson could not have harbored an objectively reasonable, good-faith belief that Webb's boorish but non-threatening and largely non-sexual conduct amounted to an unlawful employment practice under Title VII. In response to these arguments in defendant's Rule 56 Motion, plaintiff says nothing. Roberson does not even attempt to explain how the record facts and applicable law could support a reasonable conclusion that her internal complaints were statutorily protected activity. Accordingly, defendant is entitled to summary judgment on the Count III of the Complaint insofar as it is predicated on the Opposition Clause of Title VII's retaliation provision.

### 3. *Participation Clause Claim.*

In her summary judgment brief, plaintiff writes, "Andy alleges that her termination was a result of her filing charges and participating in an investigation with the EEOC, in violation of 42 U.S.C. § 2000e-3(a). This has been her claim against the Defendant since the inception of this lawsuit …." (Doc. 64, at 2.) Thus, plaintiff seeks to transform her Opposition Clause retaliation claim pleaded in Count III into a Participation Clause retaliation claim. Plaintiff's protestations notwithstanding, this is undoubtedly a new claim. Nothing in the text of her Complaint linked her retaliation claim to her participation in EEOC proceedings or her filing of an EEOC Charge;

instead, she clearly pleaded that she was retaliated against for reporting sexual harassment "through the appropriate Bancorp chain of command," namely Wright and Dominescy. Nothing in the Complaint would reasonably place defendant on notice that her legal theory was actually one under the Participation Clause, in lieu of or in addition to the Opposition Clause. Having staked herself to an Opposition Clause theory, Roberson cannot retool her Complaint via summary judgment briefing to state a different species of retaliation claim. *See, e.g., American Federation of State, County and Mun. Employees Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment or one advocating summary judgment.") (citation and internal quotation marks omitted).[29]

In an effort to forestall this result, plaintiff maintains (with no citations to authority) that "[t]here is no requirement for certain magical words to be used in a complaint" and that as long as the Complaint alleged a retaliation claim of any stripe, she is free to proceed now under either the Opposition Clause or the Participation Clause. (Doc. 64, at 2-3.) The Court cannot agree.[30] A plaintiff may not opportunistically hopscotch from the retaliation theory pleaded in her complaint to a different one not pleaded in her complaint, all in midstream and without amending her underlying pleading. *See, e.g., McShane v. U.S. Attorney General*, 2005 WL 1799435, *8 (11th Cir. Aug. 1, 2005) ("McShane did not assert in her amended complaint that she engaged in protected activity under Title VII's participation clause by initiating an E.E.O.C. complaint … Thus, the district court did not err in failing to consider this claim before granting summary

---

[29]  *See also Miccosukee Tribe of Indians of Florida v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) ("In this circuit, a plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment. … We therefore decide the Tribe's appeal of the Count IV judgment by assessing the record in the light of Count IV's allegations, as stated in the complaint."); *Georgiacarry.org, Inc. v. Georgia*, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012) ("It is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings.").

[30]  Equally misguided is plaintiff's conclusory assertion that "the complaint is sufficient to allege violations of both the participation and opposition clause." (Doc. 64, at 3.) Plaintiff identifies no language in the Complaint from which a reasonable defendant (or this Court) might discern that she claimed Bancorp had retaliated against her for filing an EEOC Charge or participating in EEOC proceedings. Of course, she cannot point to such language because it does not exist.

judgment.").[31]  Stated differently, the purpose of Rule 8(a)(2) "is to give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008) (citations and internal quotation marks omitted). Alleging that Bancorp violated Title VII's anti-retaliation provision by taking adverse actions against her after she allegedly reported discrimination "through the appropriate Bancorp chain of command" in no way gave defendant fair notice that Roberson sought to bring a Title VII retaliation claim predicated on adverse action taken after she filed an EEOC Charge.  In sum, plaintiff did not properly plead a Title VII retaliation claim predicated on the Participation Clause; therefore, she cannot withstand the Motion for Summary Judgment by arguing that defendant's conduct violated the Participation Clause.

Even if Roberson had properly pleaded and joined a Participation Clause retaliation claim against Bancorp (which she did not), summary judgment in defendant's favor would remain appropriate.  Plaintiff says in her brief that her statutorily protected activity was her filing of "a formal charge of discrimination with the EEOC, with the Formal Notice of the Charge being created and mailed on February 10, 2012."  (Doc. 64, at 12.)[32]  The insuperable obstacle plaintiff would face even if she had properly alleged a Participation Clause claim is that uncontroverted record evidence establishes that Bancorp's decision makers were unaware of these developments

---

[31]     *See generally Marshall v. Mayor and Alderman of City of Savannah, Ga.*, 2010 WL 537852, *8 (11th Cir. Feb. 17, 2010) ("We have previously rejected the argument, however, that a mere generalized claim of discrimination is sufficient to raise a particularized Title VII claim."); *Coons v. Georgia Pacific Corp.*, 829 F.2d 1563, 1568-69 (11th Cir. 1987) (rejecting plaintiff's attempt to expand Title VII claim beyond narrow denial-of-promotion claim asserted in her complaint, and finding that purported new claims were noncompliant with Rule 8(a)).

[32]     Elsewhere in her brief, plaintiff reiterates the point, asserting that "She filed an EEOC claim, which is protected activity."  (Doc. 64, at 19.)  Roberson's framing of the filing of the Charge as protected activity is consistent with Circuit precedent, which is clear that the Participation Clause "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC." *E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).  So it is the activities occurring "in conjunction with or after the filing of a formal charge with the EEOC" that matter for Participation Clause purposes.  Again, Roberson filed her formal charge with the EEOC on February 9, 2012, and the EEOC mailed that document to defendant on February 10, 2012.

on the afternoon of February 10, 2012, when they decided to place her on administrative leave and recommend her discharge. In that regard, Anderson avers that at that time, he did not know that Roberson had gone to the EEOC. (Anderson Decl., ¶ 7.) Dominescy states that the first he knew of Roberson filing an EEOC Charge was when Bancorp received a copy of that document in the mail (sometime after February 10, 2012). (Doc. 66, Exh. W.) And Wright asserts that when the decision was made, he was unaware that Roberson had met with the EEOC. (Wright Dep., at 29.) Plaintiff rebuts or contradicts none of this evidence.

To establish a *prima facie* case of retaliation under Title VII, "the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).[33] The plaintiff must present more than "mere curious timing coupled with speculative theories." *Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997). Here, Roberson has not made the requisite showing that Bancorp's decision makers were aware of her statutorily protected activity at the time they decided to place her on administrative leave and recommend termination of her employment; therefore, plaintiff has failed to satisfy the "causal connection" prong of her *prima facie* case of Title VII retaliation, and defendants are entitled to summary judgment on Count III even if it did plead a Participation Clause claim.[34]

---

[33]    *See also Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008) (similar); *Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1119 (11th Cir. 2001) ("It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression.") (emphasis added); *Collins v. Board of Trustees of University of Alabama*, 2006 WL 3522043, *1 (11th Cir. Dec. 6, 2006) (affirming dismissal of retaliation claims where "there is no evidence in the record that the supervisor responsible for Collins' workload was aware of his protected activity before increasing the workload").

[34]    Three additional points bear noting. First, plaintiff quarrels with defendant's showing that Bancorp representatives did not receive and review her EEOC Charge until February 14, 2012. Even if plaintiff had evidence that the U.S. Post Office delivered her EEOC Charge to Bancorp on February 11, and even if she had evidence that Bancorp officials opened the envelope and reviewed its contents on that date (neither of which she does), the fact remains that the challenged personnel action (*i.e.*, Bancorp's decision to place her on administrative leave and recommend her discharge) was made on the afternoon of February 10, 2012, before the EEOC mailing was ever delivered to Bancorp. Second, plaintiff offers evidence raising a plausible inference that Philip Webb was aware of plaintiff's contacts with the EEOC prior to February 10, 2012. Accepting that inference as true would not bolster plaintiff's case because (Continued)

## V.    Conclusion.

For all of the foregoing reasons, the Court finds that there are no genuine issues of material fact, and that defendant is entitled to judgment as a matter of law.  Defendant's Motion for Summary Judgment (doc. 50) is **granted**, and plaintiff's claims are **dismissed with prejudice**.  A separate judgment will enter.

DONE and ORDERED this 4th day of December, 2013.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

there is no evidence that (i) Webb was a decision maker, (ii) Webb ever communicated his knowledge about Roberson's protected activities to the decision makers, or (iii) Webb was a "cat's paw" who recommended Roberson's dismissal and whose recommendation was rubberstamped by the nominal decision makers without investigation.  Third, while the actual termination decision was made sometime after February 10, 2012, plaintiff offers no evidence that the decision maker (Bancorp's chairman) had any knowledge or awareness of Roberson's protected activity, so as to give rise to the requisite causal connection for purposes of plaintiff's *prima facie* case.  This last point is amplified by undisputed evidence that administrative leave is always or almost always a precursor to termination of employment at Bancorp, such that the February 10 decision to place Roberson on administrative leave and recommend termination was, for all intents and purposes, the only decision that mattered.